UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

EDDIE LOUIS SMITH, III,

                    Plaintiff,

        v.

BELINDA D. STEWART  et al,

                    Defendants.

CASE NO. 3:19-cv-05096-BHS-JRC

REPORT AND RECOMMENDATION

NOTED FOR: August 14, 2020

The District Court has referred this 42 U.S.C. § 1983 civil rights action to United States Magistrate Judge J. Richard Creatura pursuant to 28 U.S.C. § 636(b)(1)(A)–(B) and local Magistrate Judge Rules MJR1, MJR3, and MJR4.

Plaintiff, a prisoner proceeding *pro se*, brings suit against various Department of Corrections ("DOC") officials and employees related to his participation in the 2018 Passover meal plan.  The crux of plaintiff's claims is that the DOC wrongfully refused to allow him to switch off of the Passover meal plan back to a regular meal plan after the Passover food made him sick, resulting in plaintiff going without food other than one meal supplement shake for nine

days.  In contrast, according to plaintiff, persons who receive the Ramadan meal plan were allowed to opt out if they became ill—and this preferential treatment of Islam allegedly violated the Establishment Clause.  Plaintiff further alleges that as retaliation for plaintiff filing a grievance related to the Passover meal plan, defendant Brian Schuetter demoted plaintiff's custody level and denied him certain privileges.

The remaining defendants have now moved for summary judgment dismissal of plaintiff's claims, including his pendent claims under Washington State law.  Regarding the Establishment Clause, however, plaintiff has raised a factual dispute material to the difference in policies by providing evidence that the Passover policy did not allow for prisoners who became ill to opt-out.  Plaintiff's retaliation claim against defendant Schuetter also survives because plaintiff has raised factual issues related to whether defendant Schuetter retaliated against him by demoting his custody level.  And defendants fail to show that the Eleventh Amendment requires dismissal of plaintiff's state-law claims against them where he seeks damages from individual defendants in their personal capacities.   Thus, defendants' summary judgment motion should be denied inasmuch as they seek dismissal of the Establishment Clause and state-law claims and the retaliation claim against defendant Schuetter regarding the level demotion.

However, defendants are correct that plaintiff has failed to show deliberate indifference where he provides no more than bare allegations that "all" the Passover "meals" made him sick and where they provide undisputed evidence that Passover food encompasses a variety of foods that are not innately different from regular prison food and from which plaintiff could have self-selected his meals.  For similar reasons, plaintiff's Religious Land Use and Institutionalized Persons Act ("RLUIPA") claims should be dismissed with prejudice.  Finally, plaintiff's retaliation claim against a corrections officer who infracted him should be dismissed with

prejudice because plaintiff fails to provide evidence that but-for the claimed retaliation plaintiff would not have been infracted.

Therefore, the Court should grant in part and deny in part the summary judgment motion.

## BACKGROUND

### I. Motion to Dismiss and Remaining Claims from Amended Complaint

Plaintiff initiated this matter in February 2019, bringing claims against 25 named defendants. *See* Dkt. 1. In September 2019, the Court granted in part a defense motion to dismiss. *See* Dkt. 54. The Court dismissed claims against defendants Robert Herzog, Ron Haynes, the DOC, and Stafford Creek Corrections Center; claims for injunctive relief other than plaintiff's request to have his infraction for covering his window expunged, his request to have his level demotion for the same behavior reversed, and his request to change the Passover policy; all retaliation claims except those against defendants Lewis Villalobos and Brian Schuetter; all Free Exercise and Equal Protection claims; all claims under 42 U.S.C. §§ 1981, 1985, and 1986; and all substantive due process claims. *See* Dkt. 54, at 32; *see also* Dkt. 57.

As set forth in his amended complaint, the basis for plaintiff's remaining claims are his allegations that defendants Belinda Stewart and Jamie Dolan promulgated a Passover-observance policy for 2018 that disallowed participants from opting out during Passover. Dkt. 5, at 15; Dkt. 5-1, at 4. Plaintiff alleges that he was served his first Passover meal on March 30, 2018—and that within half an hour he became ill from the meal. Dkt. 5, at 15. Plaintiff consumed a Passover dinner that same day and, he alleges, became even more ill. Dkt. 5, at 16. Plaintiff then requested to be removed from the Passover diet by completing a religious diet form and

1  sending a kite to the chaplain, as he had been instructed by staff; plaintiff alleges that he did not

2  receive a response from the chaplain until after Passover ended.  Dkt. 5, at 16, 41.

3        Plaintiff states that the next morning, he informed defendant Villalobos of his requests,

4  but defendant Villalobos said that it was "not [his] problem" and reported plaintiff for "refus[ing]

5  mainline"—the first of many instances in which defendant Villalobos and other corrections

6  officers defendants allegedly reported plaintiff for refusing the Passover meals.  *See* Dkt. 5, at

7  17, 21, 25, 33, 37.  Plaintiff alleges that defendant Schuetter—a sergeant at plaintiff's prison—

8  then told plaintiff that Schuetter would "look into" the issue but never did.  Dkt. 5, at 18.  At

9  lunch, plaintiff again refused his meal and requested to speak to defendant Schuetter, but

10  defendant Villalobos allegedly told plaintiff that Schuetter did not want to speak to him.  Dkt. 5,

11  at 18.

12        According to plaintiff, later that day, he gave defendant Villalobos an emergency

13  grievance to file, and defendant Villalobos responded, "Oh, you like to write grievances?  Well I

14  got [sic] something coming your way."  Dkt. 5, at 19.  Plaintiff states that he later covered his

15  cell window in an attempt to get defendant Schuetter's attention.  Dkt. 5, at 19.  Defendant

16  Schuetter allegedly told plaintiff that there was not enough time that day to process his request,

17  to which plaintiff stated that unless defendant Schuetter took action, plaintiff would not receive a

18  response to his kite and grievance until Monday, two days later.  Dkt. 5, at 19.  Plaintiff states

19  that defendant Schuetter then asked him whether he wanted to lose certain privileges for "2

20  weeks or a month?"  Dkt. 5, at 20.  Allegedly, defendant Schuetter later demoted plaintiff's

21  custody level and refused to promote plaintiff's custody level when he became eligible.  *See* Dkt.

22  5, at 42.  Defendant Villalobos also infracted plaintiff for covering his window.  Dkt. 5, at 20.

23

24

Plaintiff alleges that he then asked defendant Angela Johnson, a nurse, for help but that she responded, "What do you want me to do?" and refused to give him food. Dkt. 5, at 22, 28. Plaintiff also claims that he requested defendant Nurse Kimberley Malone's assistance and that she offered to "see if I can make some calls and try to help you out" but ultimately did nothing. *See* Dkt. 5, at 25.

By April 3, 2018, plaintiff alleges that he had missed 9 meals—and that he told defendants Villalobos and "Schneider-Weiss" as much, but that they laughed and stated "sounds like you're going for ten meals." Dkt. 5, at 26. Plaintiff alleges that later that day, defendants Villalobos and Schneider-Weiss told him that his radio was taken and his level was demoted because he wrote a grievance that defendant Schuetter "didn't like." Dkt. 5, at 27.

Plaintiff alleges that by April 4, 2018, he had missed 15 meals, suffered a medical emergency, and lost 14 pounds. Dkt. 5, at 32–33. He alleges that he sent medical and mental health kites as well as an emergency grievance that was reviewed by defendant Charles Casey. *See* Dkt. 5, at 33–35. According to plaintiff, defendant Amanda Kersey denied his mental health kite due to "monetary issues," and defendant Malone did not respond to his medical kite until after Passover ended. Dkt. 5, at 39, 41. Plaintiff states that defendant Johnson responded to his emergency grievance but again refused to intercede and that defendant "Montambo" said, "Who cares if he dies, let's go." Dkt. 5, at 35. Defendant Vincent Stroup then directed defendant Johnson to infract plaintiff for filing an emergency grievance. Dkt. 5, at 36.

Passover ended on April 8, 2018, by which date plaintiff had missed 24 meals. Dkt. 5, at 40. Defendant Jeneva Cotton affirmed his infraction for covering his window (Dkt. 5-2, at 31), and defendants Danielle Armbruster and Dolan later affirmed denial of his Passover grievance. Dkt. 5, at 47.

1    Plaintiff attaches to his complaint a number of documents, including his various

2    grievances, infractions, religious diet requests, and kites; the Passover 2018 and Ramadan 2018

3    DOC memoranda; his medical records from encounters with prison medical staff; and affidavits

4    from other prisoners.  *See* Dkts. 5, 5-1, 5-2.  Plaintiff's complaint was signed under penalty of

5    perjury and is being considered as evidence.  Dkt. 9, at 29.  Because plaintiff is *pro se*, the Court

6    "must consider as evidence in his opposition to summary judgment all of [plaintiff's] contentions

7    offered in motions and pleadings, where such contentions are based on personal knowledge and

8    set forth facts that would be admissible in evidence, and where [plaintiff] attested under penalty

9    of perjury that the contents of the motions or pleadings are true and correct."  *Jones v. Blanas*,

10    393 F.3d 918, 923 (9th Cir. 2004).

11    **II.  Summary Judgment Motion**

12    Remaining named defendants other than defendant Joby Taylor—who has not been

13    served—have filed a summary judgment motion seeking dismissal with prejudice of the

14    remainder of plaintiff's claims against them.  *See* Dkt. 90.  Defendants provide a number of

15    declarations from various DOC staff and officials, which are discussed herein as relevant.  *See*

16    Dkts. 92–108.

17    Concurrent with their summary judgment motion, defendants served plaintiff with a

18    notice of summary judgment motion as required by *Rand v. Rowland*, 154 F.3d 952 (9th Cir.

19    1998).  *See* Dkt. 91.  Plaintiff has not responded to the summary judgment motion, and the

20    matter is ripe for decision.

21    ///

22    ///

23    ///

24

1                                          **DISCUSSION**

2        **I. Summary Judgment Legal Principles**

3              Summary judgment is appropriate if a moving party shows that "there is no genuine

4    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

5    R. Civ. P. 56(a).  The materiality of a given fact is determined by the required elements of the

6    substantive law under which the claims are brought.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

7    242, 248 (1986).  Factual disputes that do not affect the outcome of the suit under the governing

8    law will not be considered.  *Id.*

9              Where there is a complete failure of proof concerning an essential element of the non-

10   moving party's case on which the nonmoving party has the burden of proof, all other facts are

11   rendered immaterial, and the moving party is entitled to judgment as a matter of law.  *Celotex*

12   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 254 ("the judge must view the

13   evidence presented through the prism of the substantive evidentiary burden").  However, when

14   presented with a motion for summary judgment, the court shall review the pleadings and

15   evidence in the light most favorable to the nonmoving party, *Anderson*, 477 U.S. at 255 (citation

16   omitted), and "a pro se complaint will be liberally construed.  .  .  ."  *Pena v. Gardner,* 976 F.2d

17   469, 471 (9th Cir. 1992) (*citing Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (other citation

18   omitted).

19             Once the moving party has carried its burden under Fed. R. Civ. P. 56, the party opposing

20   the motion must do more than simply show that there is some metaphysical doubt as to the

21   material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  The

22   opposing party cannot rest solely on his pleadings but must produce significant, probative

23   evidence in the form of affidavits, and/or admissible discovery material that would allow a

24

1   reasonable jury to find in his favor.  *Id.* at n.11; *Anderson*, 477 U.S. at 249–50.  However,

2   weighing of evidence and drawing legitimate inferences from facts are jury functions, and not

3   the function of the court.  *See United Steel Workers of Am. v. Phelps Dodge Corps.*, 865 F.2d

4   1539, 1542 (9th Cir. 1989).

5          Crucially, if the moving party has not met its burden on summary judgment, the Court

6   will not grant the motion—even if there is no opposition to the motion.  *See Henry v. Gill Inds.*,

7   983 F.2d 943 950 (9th Cir. 1993) ("Summary judgment may be resisted and must be denied on

8   no other grounds than that the movant has failed to meet its burden of demonstrating the absence

9   of triable issues.").

10   **II.  Establishment Clause Claim**

11          Plaintiff brings a claim against nearly all defendants for violation of the Establishment

12   Clause of the First Amendment.  *See* Dkt. 5, at 50–51; *see also* U.S. CONST. AMEND. I.

13   Defendants' argument for summary judgment dismissal of this claim is that plaintiff cannot

14   prevail because he has no evidence showing that the Passover policy "favors one religion over

15   another and burdens the exercise of his religion."  Dkt. 90, at 26; *see* Dkt. 90, at 26–32.  This

16   argument fails.

17          First, although defendants assert that the evidence is uncontroverted that there was an

18   unwritten exception for those who became ill to opt-out from the Passover diet (Dkt. 90, at 27),

19   plaintiff has provided contrary evidence.  Attached to plaintiff's complaint are two grievance

20   responses from prison officials informing plaintiff that "Passover proc[e]dures as published

21   [s]tate specifically that once you sign up for Passover you will be required to participate for the

22   entire Passover period" (Dkt. 5-2, at 29) and—

23          In reviewing the Ramadan memo it does appear that an exception is being made to
       [sic] those who fall ill during the fast.  Passover[,] however[,] differs from Ramadan

24

as Passover is not a fast.  Although Passover meals are specific, they are served at regular meal times and currently there are no known plans for such exceptions.  If you choose to participate[,] you may have to self[-]select and not eat those items that you believe are making you ill.

Dkt. 5-2, at 36.

Thus in analyzing this issue, the Court must take as true that the Passover policy did not allow for those who became ill to opt-out—unlike the Ramadan policy.  Although defendants have presented evidence to the contrary, such evidence is not controlling at this stage of the proceeding.  The Court must take plaintiff's evidence and the reasonable inferences therefrom as true when defendants move for summary judgment.  *Anderson*, 477 U.S. at 255

Turning to defendants' legal arguments, the appropriate test for assessing the validity of governmental actions challenged under the Establishment Clause is generally the three-part framework laid out in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  *See Vasquez v. L.A. Cty.*, 487 F.3d 1246, 1254 (9th Cir. 2007) ("Notwithstanding its 'checkered career,' *Lemon v. Kurtzman*[], continues to set forth the applicable constitutional standard for assessing the validity of governmental actions challenged under the Establishment Clause." (Internal citation omitted.)).  "Under *Lemon*, a government act is consistent with the Establishment Clause if it: (1) has a secular purpose; (2) has a principal or primary effect that neither advances nor disapproves of religion; and (3) does not foster excessive governmental entanglement with religion." *Vasquez*, 487 F.3d at 1255 (citing *Lemon*, 403 U.S. at 612–13).  If a governmental policy grants a denominational preference, then the Court must apply strict scrutiny: the policy "must be invalidated unless it is justified by a compelling governmental interest and unless it is closely fitted to further that interest[.]" *Larson v. Valente*, 456 U.S. 228, 247 (1982) (citation and quotations omitted)

The Ninth Circuit has, on occasion, also applied the "endorsement test" ("whether the challenged governmental action has the purpose or effect of endorsing, favoring, or promoting religion") and the "coercion test" (the "government may not coerce anyone to support or participate in religion or its exercise") to Establishment Clause claims.  *See Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1039 (9th Cir. 2010) (internal citation omitted).

None of these tests appear in defendants' summary judgment motion.

Instead, defendants focus on the test set forth in *Turner v. Safley*, 482 U.S. 78 (1987) and, as noted above, their incorrect characterization of the record that there is no evidence that the Passover policy prevented sick prisoners from opting out of Passover meals.  *See* Dkt. 90, at 28–32.  Without explanation or argument regarding why the *Turner* test, which traditionally applies to alleged violations of the Free Exercise clause, applies here, defendants' arguments are not persuasive.  *E.g. Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008)

Moreover, even if the Court were to accept that the *Turner* test applied to this Establishment Clause claim, again, defendants' argument frames the issue as whether plaintiff could discontinue Passover for a non-medical reason.  *See* Dkt. 90, at 30 ("When meals are wasted because an inmate has a medical need to change diets, the waste is unfortunate, but necessary. . . .").  But this assumes that the plan allowed for discontinuing the Passover diet based on medical reasons:  a matter regarding which there is a genuine factual dispute.

As defendants fail to advance any other persuasive arguments in support of summary judgment dismissal of plaintiff's Establishment Clause claims, their motion should be denied in this regard.

///

///

1

### III.  Retaliation (Schuetter)

2        Plaintiff brings claims of retaliation against defendant Schuetter for participation in

3   infractions and level demotions (Dkt. 5, at 52) and alleges that defendant Schuetter initially

4   refused to talk to plaintiff about the Passover meal issue (prompting plaintiff to cover his

5   window) and then threatened plaintiff with a level demotion.  *See* Dkt. 5, at 18–20.

6        Within the prison context, a retaliation claim consists of—

7        (1) An assertion that a state actor took some adverse action against an inmate (2)
         because of (3) that prisoner's protected conduct, and that such action (4) chilled the
8        inmate's exercise of [his] First Amendment rights, and (5) the action did not
         reasonably advance a legitimate correctional goal.

9

10  *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (footnote omitted).  Protected conduct

11  includes filing prison grievances.  *Id.* at 567.

12       Plaintiff claims that on March 31, 2018, after covering his window, he attempted to speak

13  with defendant Schuetter, and plaintiff states that defendant Schuetter asked, "Do you want to

14  lose your Level 3 for two weeks or a month?"  Dkt. 5, at 20.  After the window-coverage

15  infraction, plaintiff alleges that defendant Villalobos and another told plaintiff that "the Sergeant

16  [Schuetter] didn't like that grievance you wrote the other day so he told us to take your radio and

17  he demoted your level."  *See* Dkt. 5, at 26–27.  Plaintiff alleges that defendant Schuetter later

18  refused to promote his level when plaintiff was eligible.  *See* Dkt. 5, at 26–27, 42.

19       For his part, defendant Schuetter states that he demoted plaintiff's custody level because

20  of plaintiff's refusing staff directives and covering his window—behavior that "threatened safety

21  and security and was inconsistent with level 3 behavior."  Dkt. 96, at 3.  On May 1, plaintiff

22  asked defendant Schuetter to have his level 3 privileges reinstated, but according to Schuetter,

23  "he had several negative behavior observations and infractions" and "was not then eligible for

24

1  reinstatement." Dkt. 96, at 3. Defendant Schuetter states that he reinstated plaintiff's custody

2  level on May 8, 2018, the first day that plaintiff was eligible for reinstatement. Dkt. 96, at 3–4.

3      Defendants do not challenge that plaintiff suffered an adverse action (the demotion) and

4  engaged in protected conduct (the grievance). *See* Dkt. 90, at 36–40. Instead, defendants argue

5  that plaintiff fails to plausibly allege retaliation where he relies on "uncorroborated statements"

6  that are contradicted by defendants' affidavits, where plaintiff's grievance did not mention any

7  officer, and where plaintiff had filed many other grievances. *See* Dkt. 90, at 36. But whether or

8  not plaintiff's statements about retaliatory comments made to him are corroborated goes to the

9  credibility of this evidence—a matter not before the Court. Defendants essentially ask the Court

10  to resolve the credibility argument in their favor at this stage. This Court declines to do so.

11      Further, the Court has previously concluded that plaintiff stated a plausible retaliation

12  claim against defendant Schuetter. *See* Dkt. 54, at 20 ("These factual allegations against

13  defendants Schuetter and Villalobos,[1] taken as true, plausibly support that defendants Schuetter

14  and Villalobos infracted plaintiff, demoted his custody level, and refused to promote plaintiff's

15  custody level as retaliation for filing a grievance."). Again, defendants' arguments go to the

16  relative credibility of the parties' evidence and are not valid reasons to grant their summary

17  judgment motion.

18      Defendants alternatively argue that plaintiff cannot show that retaliation was the cause of

19  the level demotion, citing the Supreme Court's recent decision in *Nieves v. Bartlett*, 139 S. Ct.

20  1715, 1722 (2019). *See* Dkt. 90, at 37. In *Nieves*, the Supreme Court set forth the causation

21  standard for retaliation claims as follows:

22      If an official takes adverse action against someone based on that forbidden motive,
        and "non-retaliatory grounds are in fact insufficient to provoke the adverse

23

24      [1] The retaliation claim against defendant Villalobos is discussed *infra*, part VII.

consequences," the injured person may generally seek relief by bringing a First Amendment claim.  [*Hartman v. Moore*, 547 U.S. 250, 256 (2006)]. . . .

To prevail on such a claim, a plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury."  *Hartman*, 547 U.S. at 259[].  It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury.  Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.  *Id.,* at 260[] (recognizing that although it "may be dishonorable to act with an unconstitutional motive," an official's "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway").

*Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

Plaintiff has provided evidence that retaliation was a substantial motivating factor in the level demotion:  Schuetter's threat to "lose your Level 3 for two weeks or a month" and Villalobos' statement that Schuetter demoted plaintiff because of the grievance.  *See* Dkt. 5, at 20, 26–27.  *See also Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (To establish the element of causation at summary judgment, a prisoner "must show that his protected conduct was the 'substantial' or 'motivating' factor behind the defendant's conduct." (Internal citation omitted.)).

Moreover, defendant Schuetter has failed to come forward with evidence showing that under *Nieves*, the adverse action would still have been taken even absent the retaliation motive.  Defendants argue that DOC policy caused the demotion:  "According to policy, custody/privilege levels in the Intensive Management Unit ["IMU"] are based on 'infraction history, . . . appropriate interaction with staff and offenders, [and other factors]. . . .'  So when [plaintiff] committed a serious infraction—especially one that interfered with monitoring/security, his behavior no longer met level 3 standards and he was demoted."  Dkt. 90, at 37.

1    But upon review, the IMU policy vests considerable discretion in DOC authorities and

2    does not mandate that an offender who commits a serious infraction has his custody level

3    demoted. *See* Dkt. 106, at 6 ("Failure to follow any directive given by staff will result in

4    appropriate action by staff and may result in your failure to gain increased privileges through

5    progression in the IMU level program."), 8 ("Negative behavior or failure to comply with

6    behavior and programming plan may result in the Unit Team demoting you to a lower MAX

7    custody level."). Based on the discretion that the IMU policy affords DOC officials, the Court

8    cannot say that the evidence is undisputed that absent the retaliatory motive, defendant Schuetter

9    would still have demoted plaintiff's level. The evidence regarding whether defendant Schuetter

10   would have demoted plaintiff but-for the retaliatory motive is conflicting enough that causation

11   cannot be decided on summary judgment.

12   Finally, defendants argue that there is no dispute of fact that defendant Schuetter's

13   actions advanced the legitimate correctional goal of "motivating positive behavior." Dkt. 90, at

14   39. Defendants provide evidence that the custody levels of IMU—where the most dangerous

15   prisoners are housed—incentivize good behavior by conditioning privileges (such as plaintiff's

16   radio, which he lost as a result of his demotion) on complying with staff directives and policies.

17   *See* Dkt. 106, at 7. But taking as true plaintiff's evidence that Schuetter acted based on a

18   retaliatory motive, Schuetter used the discretion afforded him by the DOC IMU policies as a

19   cover to retaliate against plaintiff. The Ninth Circuit has explained that in such a circumstance,

20   there is no valid penological purpose. *See Bruce v. Ylst,* 351 F.3d 1283, 1289 (9th Cir. 2003)

21   ("But, if, in fact, the defendants abused the gang validation procedure as a cover or a ruse to

22   silence and punish [plaintiff] because he filed grievances, they cannot assert that [plaintiff's]

23   validation served a valid penological purpose, even though he may have *arguably* ended up

24

1  where he belonged.").

2     Therefore, the Court finds that there are genuine issues of material fact regarding whether

3  there was a legitimate penological purpose for the level demotion and whether but-for the

4  retaliatory motive, defendant Schuetter would have demoted plaintiff.  Summary judgment

5  dismissal of the retaliation claim against defendant Schuetter for demoting plaintiff's custody

6  level should be denied.

7     To the extent that plaintiff seeks to hold defendant Schuetter liable for the infraction

8  issued by defendant Villalobos, the Court notes that the evidence is undisputed that it was

9  Villalobos, not Schuetter, who issued the infraction for plaintiff covering his window.

10  Therefore, to the extent that plaintiff brings claims against defendant Schuetter for infracting

11  him, those claims should be dismissed with prejudice.

12  **IV.  State Law Claims**

13     Plaintiff raises several state law claims, as well: gross negligence, intentional infliction of

14  emotional distress, and violation of plaintiff's right to religious freedom under the Washington

15  State Constitution.  *See* Dkt. 5, at 55–56.  Defendants provide several arguments for dismissal of

16  these claims—arguments that fail for the reasons discuss below.

17     First, defendants argue that the State's Eleventh Amendment immunity bars suits against

18  the State and State employees in federal court for damages.  *See* Dkt. 90, at 39.  To the contrary,

19  the Ninth Circuit has long held that "pendent state claims . . . against state officials acting in their

20  individual capacities" are viable in federal court.  *Pena v. Gardner*, 976 F.2d 469, 473–74 (9th

21  Cir. 1992), *as amended* (Oct. 9, 1992).  As noted above, the Court has dismissed all claims

22  against defendants who are Washington State agencies, and plaintiff's remaining claims for

23  damages are interpreted as claims against individuals in their personal capacities.

24

1    Second, defendants argue that these claims should be dismissed because neither the State

2    nor its employees can be sued for state-law tort claims unless a plaintiff first files a claim with

3    the State, which plaintiff undisputedly failed to do.  *See* Dkt. 90, at 39–41.  It is true that by

4    statute in Washington State, "[a]ll claims against the state, or against the state's officers,

5    employees, or volunteers, acting in such capacity, for damages arising out of tortious conduct,

6    must be presented to the office of risk management."  RCW 4.92.100.  But this requirement

7    applies only to suits against officials in their official (not individual) capacities.  *See id.* ("All

8    claims against the state, or against the state's officers, employees, or volunteers, acting in such

9    capacity. . . .").  At least one Washington State Court of Appeals has distinguished between

10   intentional torts and civil rights violations (no notice of suit requirement) and negligence (notice

11   of suit requirement).  *See Woods v. Bailet*, 116 Wash. App. 658, 666, 67 P.3d 511, 515 (2003).

12   Defendants here do not endeavor to make any such distinction, and plaintiff's claims appear to

13   be primarily of the types held not to require filing a claim before bringing an action.  Thus,

14   defendants' argument based on RCW 4.92.100 is not persuasive.

15   Third, defendants argue that the State has not consented to waive its Eleventh

16   Amendment immunity and to be sued for violations of state law in federal court.  Dkt. 90, at 41.

17   But, as noted above, whether the Eleventh Amendment bars a suit against the State in federal

18   court is beside the point.  Defendants do not address whether this would bar claims against

19   individuals in their personal capacities for damages or claims for prospective injunctive relief,

20   and it appears to the undersigned that plaintiff's claims fall under the exception from Eleventh

21   Amendment immunity.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Ex parte Young*,

22   209 U.S. 123 (1908).

23

24

1    Therefore, the Court should deny defendants' summary judgment motion inasmuch as it

2    requests dismissal of plaintiff's state law claims.  The Court recommends granting the remainder

3    of the summary judgment motion for the reasons discussed in the remainder of this report and

4    recommendation.

5    **V.  Deliberate Indifference**

6        **A.  Legal Standards**

7    A violation of the Eighth Amendment occurs when prison officials are deliberately

8    indifferent to a prisoner's medical needs.  *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir.

9    2004).  To establish an Eighth Amendment violation, a prisoner must make two showings:

10   "[f]irst, there must be a demonstration that the prison official deprived the prisoner of the

11   'minimal civilized measure of life's necessities,'" and [s]econd, a prisoner must demonstrate that

12   the prison official 'acted with deliberate indifference in doing so.'"  *Id.* (internal citations

13   omitted).

14   Deliberate indifference means that the prison official "'knows of and disregards an

15   excessive risk to inmate health and safety'"—the official must both "'be aware of facts from

16   which the inference could be drawn that a substantial risk of serious harm exists" and actually

17   "'draw the inference.'"  *Id.* (internal citations omitted).  "'If a [prison official] should have been

18   aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no

19   matter how severe the risk.'"  *Id.* (internal citations omitted).

20       **B.  Food Claims**

21   Plaintiff alleges that it was an Eighth Amendment violation to force him either to

22   consume the Passover diet or not to eat during Passover, which lasted for nine days.  *See* Dkt. 5,

23   at 50.  The premise of plaintiff's argument is that the Passover "food" made him sick the first

24

1    day that he consumed Passover meals and that defendants refused to provide him with regular

2    meals afterward, when he refused the Passover meals.  *See generally* Dkt. 5.  However plaintiff's

3    premise that all the Passover "food" made him sick is unsupported by the evidence that he has

4    provided.

5          Prisoners have an Eighth Amendment right to "receive food that is adequate to maintain

6    health" although the food "need not be tasty or aesthetically pleasing."  *LeMaire v. Maass*, 12

7    F.3d 1444, 1456 (9th Cir. 1993).  Where a prisoner claims that food was so unsanitary that he

8    could not consume it or was unfit for human consumption, on summary judgment the prisoner

9    must come forward with concrete evidence linking the food to a sufficiently serious risk of harm

10   for Eighth Amendment purposes.  *See Lyons v. Peters*, No. 3:17-CV-00730-SI, 2019 WL

11   3291529, at *7 (D. Or. July 22, 2019) (claims of bouts of occasional illness or food poisoning

12   caused by consumption of food, without supporting medical evidence of adverse health impacts,

13   were inadequate); *Bennett v. Misner*, No. CIV.02-1662-HA, 2004 WL 2091473, at *20 (D. Or.

14   Sept. 17, 2004) ("Neither isolated instances of food poisoning, temporary lapses in sanitary food

15   service, nor service of meals contaminated with maggots are sufficiently serious to constitute an

16   Eighth Amendment violation."), *aff'd*, 180 F. App'x 732 (9th Cir. 2006).

17         Here, defendants have provided evidence that they gave plaintiff a variety of alternative

18   food during Passover but that plaintiff refused to consume any of that food.  They provide the

19   declarations of Amy Wasser (the DOC lead coordinator for the Jewish faith) and Bryan King

20   (the DOC food services administrator).  *See* Dkts. 93, 98.  Wasser discusses the requirements of

21   kosher and Passover diets.  She explains that a kosher diet forbids consumption of pork,

22   shellfish, rabbit, and seafood without fins or scales; that permitted meats must be slaughtered in a

23   specific way and cannot be eaten with dairy; that kosher foods cannot come into contact with

24

non-kosher foods; and that packaged foods must be certified as having been prepared in accordance with kosher standards.  Dkt. 93, at 2.  For Passover, a kosher diet additionally cannot include certain items such as grain products, legumes, and leavening agents like yeast.  Dkt. 93, at 2.  She explains that kosher foods are "not innately different than other, non-kosher fruits, vegetables, milk, eggs, and so forth."  Dkt. 93, at 2.

King states that during Passover, observant inmates are served foods "like hard boiled eggs, fresh fruit (like apples and oranges), fresh vegetables (like celery and carrots), and milk, as well as a prepackaged Passover entrée."  Dkt. 98, at 3.  King also provides the 2018 Passover menu.  An example of food consumed in a day on this plan would be milk, fresh fruit, matzoh crackers, cream cheese, jelly, and hard-boiled eggs (breakfast); boxed juice, fresh fruit and vegetables, salami or bologna, matzoh crackers, and macaroons (lunch); and boxed juice, fresh fruit and vegetables, an entrée such as beef goulash, matzoh crackers, a soup cube, and margarine (dinner).  *See* Dkt. 98, at 7.  Notably, lunch on the first day of Passover included bologna.  Dkt. 98, at 7.

Based on this evidence, defendants assert that Passover food is not a discrete category, but encompasses a variety of food that is, for the most part, not inherently different from the food that plaintiff was eating on a "normal diet" and that plaintiff could have self-selected from among the variety of foods he was offered to avoid any foods that made him ill.  Dkt. 90, at 20.

As noted, plaintiff does not come forward with evidence in response to the summary judgment motion.  However, the Court has carefully reviewed the allegations of his complaint, the attachments thereto, and the other evidence of record in the light most favorable to plaintiff to determine whether there are any issues of material fact on this point.  The Court finds none.

1    Plaintiff relies on a conclusory allegation that the Passover "food" made him sick,

2    without providing factual support. But "[a] summary judgment motion cannot be defeated by

3    relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d

4    1040, 1045 (9th Cir. 1989). Plaintiff's consistent complaints that the Passover "food" or "meals"

5    made him sick are inadequate, where defendants have come forward with evidence that Passover

6    "food" was really a variety of different foods that were, for the most part, innately the same as

7    "regular" food, just separately prepared and served.

8    The sole instance in which plaintiff provides concrete evidence of which Passover food

9    made him ill is his complaint that "[t]he bologna meat" was making him sick, on March 30,

10    2018. Dkt. 5-1, at 11. For purposes of this report and recommendation the Court takes as true

11    that the bologna meat did, in fact, cause plaintiff to become ill. Nevertheless, plaintiff provides

12    no evidence to dispute defendants' evidence that the Passover 2018 menu included only six

13    meals containing bologna and does not explain why he would be unable to consume the other

14    twenty meals or other foods that accompanied the meals containing bologna. The undisputed

15    evidence presented by defendants states that of the six meals containing bologna, each meal also

16    contained at least 3 macaroons, 4 oz. of fresh vegetables, and a fresh fruit. *See* Dkt. 98, at 7.

17    Plaintiff fails to explain why he was unable to simply consume these items—and not the

18    bologna.

19    Taking plaintiff's evidence as true, he has failed to show that anything more than one

20    discrete Passover food item—bologna—made him ill. The Court is aware of at least one other

21    case ruling that periodic instances of food-related illness are not sufficiently serious to violate the

22    Eighth Amendment. *See Lyons*, 2019 WL 3291529, at *2, *7 (complaints of spoiled food

23    periodically served to prisoners did not amount to an Eighth Amendment violation). Further,

24

1   that plaintiff lost weight and otherwise felt so weak that he called a medical emergency does not

2   create a genuine issue of material fact because there is no genuine dispute that other than his

3   initial illness on March 28, plaintiff's symptoms were caused by food deprivation, not food

4   contamination.  For these reasons, even viewing plaintiff's evidence in the light most favorable

5   to him, plaintiff's weight loss and food deprivation do not establish an Eighth Amendment

6   violation.

7               **C.  Medical Care**

8               Plaintiff alleges that the Eighth Amendment was violated because no medical provider

9   intervened and provided "appropriate medical care" during Passover 2018.  Dkt. 5, at 50.

10              A "serious" medical need exists if the failure to treat a prisoner's condition could result in

11  further significant injury or the "unnecessary and wanton infliction of pain."  *Estelle v. Gamble*,

12  429 U.S. 97, 103 (1976) (internal quotation omitted).  "[T]o show deliberate indifference, the

13  plaintiff must show that the course of treatment the doctors chose was medically unacceptable

14  under the circumstances and that the defendants chose this course in conscious disregard of an

15  excessive risk to the plaintiff's health."  *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir.

16  2016) (internal quotation marks and citation omitted).  "Deliberate indifference is a high legal

17  standard.  A showing of medical malpractice or negligence is insufficient to establish a

18  constitutional deprivation under the Eighth Amendment."  *Id.* (internal quotation marks and

19  citation omitted).

20              Inasmuch as plaintiff grounds his claim of deliberate indifference to his medical needs on

21  his claim that defendants refused to provide him food that he could consume, as noted above, this

22  argument fails, even taking the evidence in the light most favorable to plaintiff.

23

24

1    Further, to the extent that plaintiff grounds his claim on lack of medical care for his

2    symptoms of food deprivation, the undisputed evidence does not support his claim.  In support of

3    their summary judgment motion, defendants come forward with evidence that medical providers

4    regularly checked on plaintiff, including checking his vitals, exhorting him to eat at least a

5    portion of his food, and providing him with a meal supplement beverage on one occasion.

6    For instance, defendants provide uncontested evidence that on April 1, 2018, medical

7    staff evaluated plaintiff at his cell door.  Dkt. 106, at 29.  On April 2—by now, the third full day

8    plaintiff had not eaten—defendant Nurse Malone checked on plaintiff at his cell door, asking

9    him why he continued to refuse meals, to which he responded that "without action there can't be

10   change" and that he intended to continue refusing his meals.  Dkt. 97, at 1.  Plaintiff's version of

11   this event similarly is that he told Nurse Malone that the "meals" made him sick, but "nobody

12   cares," and that if he "d[idn't] take some type of action," he would not "see change."  Dkt. 5, at

13   24.  It should be noted that although contested by plaintiff, the facts strongly suggest that

14   plaintiff was engaging in a hunger strike to protest the DOC Passover policy.

15   Plaintiff does not contest that another nurse attempted to take plaintiff's vital signs on

16   April 2, but he refused.  Dkt. 105, at 1.  The nurse encouraged plaintiff to eat "at least part of his

17   meal," to continue to drink fluids, and to notify the medical department if he noticed changes to

18   his physical health.  Dkt. 105, at 2.  According to the nurse, plaintiff stated that he was on a

19   hunger strike to protest the quality of DOC food.  Dkt. 105, at 2.  Plaintiff does not contest that

20   on the same day, he also wrote a letter to Washington State Governor Jay Inslee stating that he

21   was on a hunger strike to protest the food quality.  *See* Dkt. 107, at 1.

22   At dinnertime on April 3, defendant Johnson evaluated plaintiff.  *See* Dkt. 90, at 11; Dkt.

23   100, at 1.  Plaintiff states that he told defendant Johnson that he was experiencing chest,

24

1    abdominal, and stomach pain and felt lightheaded and dizzy.  Dkt. 5, at 29.  Both parties provide

2    defendant Johnson's primary encounter report, which states that plaintiff "continues to refuse

3    meals," that defendant Johnson told plaintiff "that he would make himself ill if he continues,"

4    and that plaintiff "[r]efuse[d] nursing assessment."  Dkt. 5-2, at 7; Dkt. 100, at 5.

5        Defendants assert that on April 4, plaintiff declared a medical emergency and was

6    evaluated by defendant Nurse Johnson.  The details of this encounter are uncontested:  plaintiff

7    complained of dizziness, shortness of breath, and chest pain, and defendant Johnson found that

8    his vital signs were normal and cautioned him that "refusing to eat for 14 meals could cause

9    these symptoms."  Dkt. 5, at 32; Dkt. 5-2, at 9; Dkt. 90, at 13.

10        The morning of April 5, it is again uncontested that medical staff came to plaintiff's cell

11    front.  Dkt. 106, at 30.  According to defendant Johnson's report, plaintiff declared a medical

12    emergency for chest pain and was escorted to the medical office, where his vital signs were

13    normal.  Defendant Johnson "[a]gain discussed . . . the symptoms and signs that appear with

14    refusal of food for 6 days" and plaintiff agreed to consume a meal supplement drink.  Defendant

15    Johnson instructed plaintiff to notify staff if his chest pain returned and to drink water.  Dkt. 100,

16    at 13.

17        Plaintiff allegedly stated that he was having hunger pains, not chest pains.  Dkt. 95, at 15;

18    Dkt. 100, at 2.  Defendant Johnson then infracted plaintiff for "declar[ing] a false medical

19    emergency to obtain additional medical attention instead of eating the mainline meal offered to

20    him" and for engaging in and encouraging a hunger strike.  Dkt. 100, at 17.  For his part, plaintiff

21    contests this version of facts inasmuch as he claims he was infracted for simply "declaring

22    emergencies."  Dkt. 5, at 36.

23

24

1    On April 6, defendant Kersey informed plaintiff that there would be a $4 copay to see a

2    mental health provider and asked if plaintiff wished to schedule an appointment, which he did

3    not do.  Dkt. 90, at 15.  Although plaintiff claims that defendant Kersey refused to see him, the

4    evidence that plaintiff relies on squarely contradicts this conclusory allegation, so that the Court

5    will not take it as true.  *See* Dkt. 5-2, at 13 (offering to schedule an appointment for plaintiff):

6    *Scott v. Harris*, 550 U.S. 372, 380 (2007) (Where the party opposing summary judgment

7    presents a version of the facts that is blatantly contradicted by the record "so that no reasonable

8    jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a

9    motion for summary judgment.")

10    Finally, on April 9, 2018, according to the undisputed evidence in the record, defendant

11    Nurse Malone responded to a medical services kite that plaintiff had sent on April 4, stating that

12    Passover was completed.  Dkt. 5-2, at 11.

13    From this evidence, the most that can be said is not that plaintiff was denied medical

14    care but that he chose not to eat when the bologna meat made him ill.  There are no facts that,

15    viewed in the light most favorable to plaintiff, would lead a rational trier of fact to conclude that

16    any particular medical care of plaintiff provided by defendants was medically unacceptable

17    under the circumstances or was chosen in conscious disregard of an excessive risk to plaintiff's

18    health.  Plaintiff's deliberate indifference claims based on medical care should be dismissed with

19    prejudice.

20    **VI.  RLUIPA**

21    Plaintiff brings a claim under RLUIPA for "morally coerc[ing]" him "to conform his

22    behavior according[] to the mandates of the religious conduct published by DOC."  Dkt. 5, at 53.

23

24

REPORT AND RECOMMENDATION - 24

As relevant here, RLUIPA prohibits the government from "impos[ing] a substantial burden on the religious exercise of a [prisoner] . . . unless the government demonstrates that imposition of the burden on that person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1.

Here, it is unclear whether the burden that plaintiff asserts is that he was unable to practice Passover because the "meals" made him ill or that the Passover policy burdened his religious practice by "coercing" him to remain on a Passover diet when he wished to be taken off the diet. Regarding the former theory, as discussed extensively above, plaintiff has come forward with no evidence from which a rational trier of fact would conclude that either (1) "all" the Passover food made plaintiff sick or (2) he was unable to observe Passover by self-selecting from the foods provided to him and avoiding the lunch meat that he states made him ill. A mere inconvenience (such as self-selecting from Passover options) does not amount to a substantial burden on religious practice under RLUIPA. a mere inconvenience is not enough to rise to the level of a constitutional. *See Ohno v. Yasuma*, 723 F.3d 984, 1011 (9th Cir. 2013).

Regarding the theory that plaintiff was "coerced" to stay on the Passover diet, according to plaintiff, he had to quit the Passover diet because of illness—not because of change of belief. Therefore, plaintiff also fails to provide any evidence that he was coerced to observe a religious practice against his will.

Plaintiff fails to come forward with any evidence that would tend to show a substantial burden to his religious practice, and his RLUIPA claim should be dismissed with prejudice.

///

///

1      **VII. Retaliation (Villalobos)**

2      Plaintiff alleges that defendant Villalobos retaliated against him for filing a grievance by

3  infracting him. Dkt. 54, at 19–23.

4      For his part, defendant Villalobos states that on March 31, 2018, he noticed that plaintiff

5  had covered his cell window, in violation of prison policies. Dkt. 94, at 2. Plaintiff refused to

6  uncover his window, and defendant Villalobos infracted him. Dkt. 94, at 2. Defendant

7  Villalobos denies that he acted out of animosity toward plaintiff. Dkt. 94, at 2.

8      However, plaintiff claims under penalty of perjury (Dkt. 5, at 12), that on the morning of

9  March 31, 2018, plaintiff gave an emergency grievance to defendant Villalobos to file and that

10  Villalobos said, "'Oh, you like to write grievances? Well I got something coming your way.'"

11  Dkt. 5, at 18–19. Defendant Villalobos then infracted plaintiff on the basis that he covered his

12  cell window, purportedly to speak with defendant Schuetter. Dkt. 5, at 19–20. Based on this

13  account, plaintiff argues that he was infracted as retaliation for filing a grievance.

14      Plaintiff has provided evidence of an adverse action (the infraction) and protected

15  conduct (the grievance). However, the Court agrees with defendants that plaintiff has not

16  provided sufficient evidence from which a rational trier of fact could find that the adverse action

17  was "because of" the protected conduct, based on the standard set forth in *Nieves*. *See* 139 S. Ct.

18  at 1722.

19      The undersigned assumes without deciding that defendant Villalobos' statement upon

20  learning plaintiff intended to file a grievance was evidence from which a trier of fact could

21  conclude that retaliation may have been a substantial motivating factor in Villalobos' decision to

22  infract plaintiff later that day. *See Brodheim*, 584 F.3d at 1271. However, defendants have

23  provided evidence that even so, once plaintiff covered his window, Washington State regulations

24

1    required plaintiff to be infracted.  Namely, defendants cite to W.A.C. 137-28-270, stating that a

2    staff member who witnesses a serious violation "shall prepare and submit an infraction report per

3    department policy" and the serious infraction report and hearing findings that covering a cell

4    window was such a serious infraction.  *See* Dkt. 92, at 54–55; Dkt. 94, at 20.

5          Plaintiff admits to covering his window and has provided no evidence or argument

6    tending to controvert that defendant Villalobos was obligated to infract plaintiff, regardless of

7    defendant Villalobos' subjective attitude toward plaintiff.  Therefore, there is no dispute that

8    even absent the retaliatory motive alleged, defendant Villalobos would have infracted plaintiff,

9    and, under *Nieves*, summary judgment dismissal of the retaliation claim against defendant

10   Villalobos is appropriate.

11   **VIII.  Unserved Defendants and Defendant Joby Taylor**

12         Plaintiff has named multiple "John Doe" defendants as well as defendant Joby Taylor,

13   another corrections officer.  *See* Dkt. 5.  The Court has been unable to serve the unnamed

14   defendants since plaintiff has not provided sufficient identifying information.  And the Court has

15   been unable to serve defendant Taylor despite multiple efforts, including the U.S. Marshals'

16   attempt at personal service.  *See* Dkts. 48, 55, 78.

17         It has been well more than 90 days since the complaint in this matter was filed.  Plaintiff

18   can no longer timely effect service on any of these defendants.  Therefore, the Court should also

19   *sua sponte* dismiss without prejudice claims against the unnamed defendants and against

20   defendant Taylor for lack of service.  *See* J*ohnson v. Meltzer*, 134 F.3d 1393, 1396 (9th Cir.

21   1998) (proper to dismiss without prejudice unserved defendant in decision granting summary-

22   judgment motion brought by other defendants); *Franklin v. Giurbino*, 2017 WL 24862, at *6

23   (N.D. Cal. Jan. 3, 2017) (granting served defendants' motion to dismiss plaintiff's Eighth

24

1  Amendment claims and dismissing same claims against unserved defendants because "the

2  allegations against [them] are the same," other defendants were entitled to qualified immunity,

3  and "[t]here [was] no suggestion in the complaint or in the briefs" that analysis would differ for

4  unserved defendants), *appeal dismissed*, 2017 WL 3951862 (9th Cir. July 13, 2017).

5                                          **CONCLUSION**

6            The undersigned recommends that defendants' motion for summary judgment be granted

7  in part and denied in part. *See* Dkt. 90. Specifically, all claims should be dismissed with

8  prejudice except those for violation of the Establishment Clause, for retaliation by defendant

9  Schuetter related to plaintiff's custody level demotion, and the state law claims. The unnamed

10  defendants and defendant Taylor should be dismissed from this matter.

11            Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

12  fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

13  6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

14  review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

15  of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v.*

16  *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

17  imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **August 14,**

18  **2020** as noted in the caption.

19            Dated this 29th day of July, 2020.

20

21            _____

22            J. Richard Creatura
              United States Magistrate Judge

23

24